******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SOLOMON TAYLOR
(AC 39659)

Alvord, Sheldon and Prescott, Js.

*Syllabus*

Convicted, after a trial to a three judge court, of the crimes of murder, robbery in the first degree, conspiracy to commit robbery in the first degree, hindering prosecution in the second degree and tampering with physical evidence, the defendant appealed. The defendant's conviction stemmed from an incident in which he and a coconspirator, W, allegedly shot and killed the victim during an alleged drug transaction. On appeal, the defendant claimed that the evidence was insufficient to support his conviction of murder, robbery in the first degree and conspiracy to commit robbery in the first degree, and that the trial court improperly disqualified his first court-appointed attorney, H, on the basis of an alleged potential conflict of interest related to H's representation of J, a potentially material witness for the state in the present case, in a prior criminal case. *Held*:

1. The defendant could not prevail on his claim that the evidence was insufficient to support his conviction of murder, robbery in the first degree and conspiracy to commit robbery in the first degree on the ground that there was no evidence that a robbery had occurred, and, therefore, there also was no proof of a conspiracy to commit robbery or of murder under the doctrine of *Pinkerton* v. *United States* (328 U.S. 640), pursuant to which a coconspirator may be found guilty of a crime that he did not commit if the state can establish that a coconspirator did commit the crime and that the crime was within the scope and in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy; on the basis of the evidence presented and the inferences reasonably drawn therefrom, which established that W agreed to buy drugs from the victim and told the defendant about it, that the defendant was a passenger in the car when W drove to the victim's home while armed, and that they convinced the victim to bring the drugs to the car and then struggled with the victim, who fought back, ultimately shooting him in the head and arm and driving away with the drugs in the car, the court reasonably could have found that the defendant and W robbed the victim, that they did so in furtherance of an agreement to commit a robbery while at least one of them was armed with a deadly weapon, and that the murder of the victim was committed in furtherance of that conspiracy and was a reasonably foreseeable consequence thereof.

2. The trial court did not abuse its discretion in granting the state's motion to disqualify H: the defendant, who was indigent, had no constitutional right to select his appointed counsel, and the court did not act arbitrarily in disqualifying H and appointing new counsel when, as in the present case, a potential conflict of interest existed that could have compromised the integrity of the trial if H continued to represent the defendant, the court having determined that J was expected to provide key testimony regarding the firearm used in the robbery in the present case by connecting it to the prior shooting incident for which H had represented J, and, therefore, H could have experienced great difficulty in cross-examining J about the facts and circumstances surrounding the incident in which she represented J without violating J's rights; moreover, the fact that J did not ultimately testify about the defendant's use of the firearm in question could not be considered, as the trial court could not have known that J would not so testify when it ruled on the motion to disqualify, and the defendant was not prejudiced as a result of H's disqualification.

Argued March 9—officially released October 10, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder,

felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, hindering prosecution in the second degree and tampering with physical evidence, brought to the Superior Court in the judicial district of Waterbury, where the court, *Fasano, J.*, granted the state's motion to disqualify defense counsel; thereafter, the matter was tried to a three judge court, *Crawford, Roraback* and *Moll, Js.*; finding of guilty of murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, attempt to commit robbery in the first degree, hindering prosecution in the second degree and tampering with physical evidence; subsequently, the court, *Crawford, Roraback* and *Moll, Js.*, vacated the finding of guilty on the charges of felony murder and attempt to commit robbery in the first degree, and rendered judgment of guilty of murder, robbery in the first degree, conspiracy to commit robbery in the first degree, hindering prosecution in the second degree and tampering with physical evidence, from which the defendant appealed. *Affirmed*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Amy Sedensky*, senior assistant state's attorney, and *Dana Tal*, legal intern, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Solomon Taylor, appeals from the judgment of conviction, rendered after a trial before a three judge court, on charges that included murder, under the *Pinkerton* doctrine,[1] in violation of General Statutes § 53a-54a (a), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2).[2] On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction for murder, robbery in the first degree and conspiracy to commit robbery in the first degree because the evidence does not support the court's findings that he and his alleged coconspirator committed or conspired to commit robbery, and (2) the court improperly disqualified his first attorney approximately twenty months before the start of his trial. We affirm the judgment of the trial court.

The following facts were found by the trial court. The defendant and his alleged coconspirator,[3] Joseph Walker,[4] were long-standing and close acquaintances. They had known each other for years, and Walker and the defendant's sister have a child together. On May 12, 2012, between 7 and 8 p.m., the defendant, Walker and some other friends went to the apartment of Alexia Bates, the defendant's girlfriend, stayed for approximately half an hour to forty-five minutes, and then left.

That same day, the victim, David Caban, called his cousin, Angelo Caban (Angelo), and informed him that he had money he owed Angelo and that Angelo could come to his home that evening to pick it up. The victim lived at 127 Proctor Street in Waterbury with his girlfriend, Lourdes Santana. Santana overheard the victim on his cell phone, saying something about "G's." She knew this was a reference to grams and that the victim's nickname, Yayo, meant cocaine. Santana saw that the victim received a phone call that evening from Walker. She recognized the name on the phone from a call that the victim had received two or three days prior. The earlier call had come while the victim was in the shower. He had asked her to answer the phone and give Walker directions to the house.[5] The victim told her that he had been in jail with Walker, and Santana knew that he had been in jail for selling cocaine. After that earlier phone call, Walker had come by the house, and Santana had seen the white Mitsubishi Galant that he was driving. The victim had gone outside to the car for five to ten minutes.

On May 12, 2012, Angelo arrived between 8 and 8:30 p.m., and saw the victim's friend, Anthony Jackson, outside the victim's home. The victim told Jackson that he was waiting for someone. Inside, Angelo saw the victim pacing while the victim was talking on the phone.

The victim told Angelo that he was going to "bust a trap," meaning he was going to make a drug transaction. Angelo knew that the victim sold narcotics and that his repayment by the victim would come from a drug sale. Shortly after Angelo arrived at the house, after the phone call from Walker to the victim, Angelo was looking out the kitchen window when he saw a four door Mitsubishi Galant pull up with two black males in it, one in the driver's seat and one in the front passenger seat. This car later was identified as the white Mitsubishi Galant owned by Bates, which the defendant used more than she did.

The victim went outside, saying he was going to talk to "his boy." He went to the Mitsubishi, greeted the occupants of the car and got halfway into the car through the rear passenger side door. Then the victim got out of the car and went inside the house. After entering the bedroom for fifteen to twenty seconds, he came out with something in his hand, which he held "cupped" to his side. As he walked downstairs, he told Angelo to stay where he was and watch over him. He returned to the Mitsubishi and sat in the rear passenger side.

Angelo looked out the window and saw the victim give "dap" (a greeting or locking of hands). Angelo then went outside, where he had a clear view of the Mitsubishi. He saw the victim struggle with someone in the front seat. He also heard muffled gunshots and saw sparks from a gun. Angelo saw the victim grab one of the males in the front seat of the car by the wrist after the victim had been shot in the arm. The other occupant then reached around and shot the victim in the head. Angelo went to the backseat and tried to pull the victim out of the car. He then went around the back of the car, and Walker, who was in the driver's seat, got out of the car and put a dark metal gun in his face. The person in the passenger seat got out of the car and said to Walker, "[y]o, forget it." When Walker turned toward the passenger, Angelo smacked his hand and ran back to his own car, which was parked behind the Mitsubishi.

Jackson, still sitting outside the victim's home, also saw the Mitsubishi Galant pull up with two black males in it. He saw the victim come outside and get in the backseat. Jackson then saw tussling, heard gunshots and saw sparks in the middle of the back of the car. He got up, grabbed a scooter and ran to the passenger side. He broke the front window with the scooter and leaned in and tried to hit the man in the passenger seat. When he saw a chrome shiny object in the passenger's hand, he ran. The Mitsubishi was gone when he returned.

Santana was in the bedroom when her mother came in and told her that they were shooting at the victim outside. Santana ran to the door, looked outside and

saw the victim in the back trying to get out of the Mitsubishi and someone trying to pull him back into the car, then saw the car take off. She tried several times to reach the victim on his cell phone. The first time she called, a man answered. She asked for the victim and the person hung up. She called again and yelled into the phone, and the person hung up. Angelo and Santana tried to follow the Mitsubishi in Angelo's car. They found the victim at the side of the curb on Sylvan Avenue near the intersection with Proctor Street, lying on the ground on his stomach with blood coming from his head.

The defendant and Walker returned to Bates' house in the Mitsubishi at approximately 9:30 p.m. Walker went into the bathroom and would not let anyone in with him. The defendant called Bates into the bedroom. He was pacing and rambling. The defendant told Bates that "crap went wrong" and that Walker had been shot. Bates saw blood on the top of the defendant's underwear. The defendant had a phone in his possession that kept ringing, and when he answered it, Bates could hear a girl screaming on the other end. The defendant looked confused.

The defendant ordered Bates to get his gun from the car. She described the gun as small and dark colored. She had seen it two or three times within one month and knew the defendant kept it in the baseboard heater. She retrieved the gun from the car and gave it to the defendant, who put it in his waistband.

The defendant then told her to go clean the car. She collected some cleaning supplies, and she and the defendant went down to the car. When Bates and the defendant got to the car, she saw the front passenger window smashed out, a hole in the roof and blood on the front passenger seat, back passenger seat and floor. She found both of the defendant's phones on the floor under the seat. One was a red phone, identical to the one he had in his possession that had been ringing. The defendant, on Bates' discovery of both of his phones in the car, realized the phone that had been ringing in the bedroom was not his. The defendant then said it was "Son's"[6] phone, and he smashed Son's phone in the driveway. Someone across the street returned it to him, but he smashed it a second time and threw it away. Bates also saw crack on the floor of the car. Some of the pieces of crack had blood on them. She collected the crack, placed it in a sandwich bag and gave it to the defendant. He then put the crack in his pocket. She and the defendant removed all the items from the car and placed them in several Epic bags.[7] Bates then cleaned the car thoroughly with Windex and Clorox. She scrubbed the seats and cleaned up the blood.

Bates asked the defendant what happened, and he told her they had been in New Britain and that someone had tried to rob them and shot up the car. He told

her that someone named "Son" had been shot in the shoulder and the leg, which explained the blood, and they took him home.

Later that night, Miguel Rivera showed up at Bates' apartment. He saw the defendant in the kitchen standing by a table, on which was crack that looked like it had blood on it. The defendant said he had spilled juice on it. He asked Rivera if he knew anyone who wanted to trade an eight ball, a .38 special and two hundred dollars. Rivera described the defendant as moving around, mad and frustrated. Bates heard the defendant talking to Rivera about selling the crack for a cheaper price because of the blood and also discussing trading a gun for drugs.

At approximately 10 p.m., Walker called the defendant's friend, Julian Warren, and asked him to come to Bates' apartment. When Warren arrived, he saw the defendant and Bates cleaning the car. He saw the broken front window, blood, broken glass and two bullet holes in the roof. When he went upstairs, he saw Walker with his hand bleeding and wrapped in a white shirt, and crack with blood on it in the bathroom sink. Warren and his friend, Calvin, drove Walker to New York and dropped him off close to a hospital. Warren returned to Connecticut, dropped Calvin off and returned to Bates' apartment between 5 and 6 a.m. on May 13, 2012.

The defendant had a second girlfriend, Quantashay Nealy, who was staying at the Motor Lodge on South Main Street in Waterbury from May 12–13, 2012. In the morning on May 13, 2012, the defendant drove Warren in Warren's car to the Motor Lodge. The defendant went to Nealy's room and told her something was wrong. He paced back and forth and said he had been with Walker and something happened. She asked if someone got hurt and he said yes. Nealy saw the defendant take crack out of his pocket, one big piece the size of a baseball and several little pieces that looked like rocks. Some of the pieces had blood on them. He stayed for five or six minutes, then left, leaving the drugs and his iPhone behind.

Still in Warren's car, the defendant and Warren returned to the Motor Lodge later that morning, but Nealy was not there, and they left. The defendant asked Warren to drive him to New York. Within three to four minutes, they were pulled over by a police officer, and the defendant was taken into custody.

On May 12, 2012, Brian Juengst, then a crime scene technician, went to Bates' apartment and saw the Mitsubishi in the driveway. He saw two bullet holes in the roof of the car and blood-like stains in the car. He smelled cleaning products, and it appeared to him that someone had tried to wipe or destroy evidence. He retrieved several samples of the blood-like stains.

Juengst found the red backing to a cell phone in the

driveway and the main body of the phone in the vacant lot next door. The phone was identified as the victim's cell phone. Juengst also found an Epic bag inside of Bates' apartment with cleaning supplies and the defendant's underwear in the refuse on the back porch. The underwear had blood-like stains on it.

Juengst took many blood samples and sent them to be processed. Most of the samples taken from the car, in particular from the backseat, were from the victim. The blood-like stain on the defendant's underwear was the victim's blood.

Additionally, the court noted that it considered (1) the call detail reports relating to the cell phones used by the defendant, Walker and the victim; and (2) the testimony of representatives from the cell phone providers, Verizon Wireless, Sprint and AT&T, relating to such reports. The call detail reports reflected text messages and/or telephone calls on and around May 12, 2012, between, among others, Walker and the victim, Walker and the defendant, Bates and the defendant, and Walker and Warren. The court also noted that it considered the testimony of Special Agent Kevin Horan of the Federal Bureau of Investigation, who analyzed the call detail reports of Walker, the defendant and the victim, and who presented an analysis reflecting the times of certain communications among them, the respective locations of the cell phone towers in Waterbury and the proximity of those towers to, among other locations, Bates' apartment, the victim's home and place of the shooting, and the Motor Lodge. The court concluded that this evidence corroborated the locations and movements of the defendant on May 12 and 13, 2012.

In the operative information, the defendant was charged with murder, conspiracy to commit murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, attempted robbery in the first degree, hindering prosecution in the second degree and tampering with physical evidence. After a bench trial, the defendant was found guilty of seven of the eight charges against him. See footnote 2 of this opinion. The court sentenced the defendant as follows: (1) on the charge of murder, fifty-five years incarceration, twenty-five of which were mandatory; (2) on the charge of robbery in the first degree, twenty years incarceration, five of which were mandatory; (3) on the charge of conspiracy to commit robbery in the first degree, twenty years incarceration, five of which were mandatory; (4) on the charge of hindering prosecution in the second degree, ten years incarceration; and (5) on the charge of tampering with physical evidence, five years incarceration. The court ordered all sentences to run concurrently, resulting in a total effective sentence of fifty-five years of incarceration, twenty-five years of which were mandatory. This appeal followed. Additional facts will be set forth as necessary.

# I

The defendant first claims that the evidence was insufficient to support his conviction for murder, robbery in the first degree and conspiracy to commit robbery in the first degree. Specifically, he claims: "[t]here was no evidence that Walker or [the defendant] had robbed [the victim]." He argues: "[W]hile there was evidence that Walker was involved in a drug deal with [the victim], even if [the defendant] was there, there was no evidence offered to the trial court that a robbery occurred. [The defendant] had a quantity of crack afterward, but there was no evidence that it was stolen from [the victim]." By the same logic, the defendant argues that because there was no proof of a robbery, there was no proof of a conspiracy to commit robbery or of murder under the *Pinkerton* doctrine.[8] We disagree.

"In considering the defendant's challenge, we undertake the same limited review of the panel's verdict, as the trier of fact, as we would with a jury verdict." *State v. Bennett*, 307 Conn. 758, 763, 59 A.3d 221 (2013).

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the [court's finding of guilt]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.)

*State* v. *Bush*, 325 Conn. 272, 285–86, 157 A.3d 586 (2017).

The defendant argues that the state failed to introduce any evidence that he intended to take drugs from the victim without paying for them. He contends: "Walker and [the victim] agreed to a drug deal, and [the victim] was shot after that transaction. Obviously, something went wrong after the transaction, but the state did not present any evidence that [the defendant] agreed or intended to take drugs from [the victim] without paying for them." We disagree.

"A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . he or another participant in the crime . . . is armed with a deadly weapon . . . ." General Statutes § 53a-134 (a) (2). "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner . . . ." General Statutes § 53a-119.

"To establish the crime of conspiracy under § 53a-48 . . . it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citations omitted; internal quotation marks omitted.) *State* v. *Danforth*, 315 Conn. 518, 531–32, 108 A.3d 1060 (2015).

"[T]he existence of a formal agreement between the conspirators need not be proved [however] because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy

can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . Finally, [b]ecause direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) Id., 532–33.

Construing the evidence in the light most favorable to sustaining the court's finding of guilt, we conclude that there was sufficient evidence to support the defendant's conviction of the crimes of robbery in the first degree and conspiracy to commit robbery in the first degree. The defendant challenges the larceny and agreement elements of these charges, arguing that there was no evidence he took or intended to take drugs or money from the victim, or that he agreed to do so.

In the present case, the court, acting as the trier of fact, found that there were multiple calls and text messages on the evening of May 12, 2012, between Walker and the victim and Walker and the defendant. Walker and another black male drove to the victim's home in the car of the defendant's girlfriend. The victim went to the car, briefly spoke with the occupants, returned to his home and came back out to the car with something cupped in his hand. After the victim got back into the car, he struggled with the occupants in the front seat, which resulted in a shooting inside the car. The car then drove away. Walker and the defendant returned to Bates' home, where the defendant had Bates collect his gun and some bloody crack from the car. The defendant then attempted to sell or trade the crack at a discount. He was visibly upset and pacing, telling both of his girlfriends that something had gone wrong that night. At Bates' home, the defendant learned that he had two identical red phones in his possession, and he destroyed the one that he told her belonged to "Son."

From those findings and from the court's statements that it noted and credited regarding the call detail reports and the testimony of Horan, it reasonably could be inferred that Walker made an agreement to buy drugs from the victim and told the defendant about it. The defendant was the passenger in the car when Walker drove to the victim's home. The victim was expecting to sell Walker drugs for cash, which he would then use to repay Angelo. Instead, Walker and the defendant showed up at the defendant's home armed. They convinced the victim to bring the drugs to the car and then struggled with the victim, ultimately shooting him in the head and arm and driving away with the drugs in the car. The defendant's statements that something had gone wrong indicated that there had been a plan. He did not expect to be in possession of the victim's phone, and he attempted to destroy it when he realized that it belonged to the victim.

Viewing the evidence in the light most favorable to sustaining the court's finding of guilt, as we must, we conclude that the court reasonably found, on the basis of the evidence presented and the reasonable inferences drawn therefrom, that the defendant and Walker robbed the victim, who fought back, and that they did so in furtherance of an agreement to commit a robbery while at least one of them was armed with a deadly weapon. Because the murder of the victim was committed in furtherance of that conspiracy, and was a reasonably foreseeable consequence thereof, such proof of conspiracy also supported the defendant's conviction for murder under the *Pinkerton* doctrine. Accordingly, we find no merit to the defendant's claim.

## II

The defendant next claims that "[t]he trial court (*Fasano, J.*) abused its discretion and violated [his] sixth amendment right to counsel when it disqualified [his] first attorney." Specifically, the defendant claims that, in determining whether to disqualify his court-appointed attorney based upon an alleged potential conflict of interest, the court failed to consider his constitutional right to continued representation by that attorney. The state counters that the defendant, who was indigent, had no constitutional right to choose his appointed counsel, and, further, that the court did not act arbitrarily when it disqualified the defendant's assigned counsel, and thus did not abuse its discretion in so doing. In his reply brief, the defendant acknowledged, as the state argued, that an indigent defendant does not have a constitutional right to his choice of assigned counsel, but reiterated his argument that "once that counsel has been assigned and the defendant has begun a relationship with his counsel, the defendant has a constitutional protection against the state or the courts interfering with that relationship absent a showing that the likelihood and dimensions of any conflicts of interest are substantial. We agree with the state.

The following facts are relevant to this claim. Approximately two years before his trial, the defendant was represented by assigned counsel, Attorney Vicki Hutchinson. On May 31, 2013, the state filed a motion to disqualify Hutchinson on the ground that she previously had represented Warren, potentially a major and material state's witness in the case against the defendant to whom she owed a duty of loyalty and whose interests were adverse to the defendant's. Although the defendant waived any conflict of interest, Warren did not. The defendant objected to the motion to disqualify.

At a hearing regarding the matter on May 31, 2013, Hutchinson represented that she was appointed by the public defender's office to represent Warren on a different matter on November 29, 2011. She formally was appointed to represent him by the court on November

30, 2011. She received discovery from the state and met with Warren once in jail. Warren's charges were interfering with an officer, attempt to commit assault in the first degree, reckless endangerment in the first degree, illegal discharge of a firearm and carrying a pistol without a permit, but no firearm was ever recovered. She did not do any "legwork" on the case and spoke to Warren once in jail and to his mother a few times. She did not anticipate a conflict in cross-examining Warren because the only information she had was from public records and any attorney could cross-examine him on conflicting statements from his original case.

The court found: "Here the defendant is charged in concert with a co-defendant Walker in a homicide. An incident that resulted in the death of a David Caban during the course of what appeared to be, at least factually appears to be a drug deal gone bad. I did hear much of the testimony in the [probable cause hearing]. Mr. Warren, who is the witness in question, testified in the [probable cause hearing]. Based on that testimony alone if the decision were being made, based only on the testimony I heard in the course of the [probable cause hearing], frankly, it wasn't the key evidence in the state's case with respect to Mr. [Warren] who is basically seeing the vehicle after the incident. The defendant—the witness was not a particularly strong witness, not a particularly effective witness. And under the circumstances I think the equities would favor the defendant retaining counsel under the circumstances of the testimony I heard.

"Now the claim is totally different. The witness takes on a different role. He's now a witness—key witness and I'm going—at least be a chain in the link that connects this defendant to a specific firearm. A firearm that, apparently, other witnesses will testify fits the description of the firearm used in the homicide. And so now that this defendant is not just placed in the car with a co-defendant at the time of the homicide but now—which was the testimony at the hearing in probable cause, but now his gun, the gun that this witness Julian Warren will identify as the gun, he has seen the defendant in possession of. He's seen the defendant actually use this gun. Now [it's] going to be allegedly connected to the gun used in the homicide. That he was with the defendant when the defendant actually used the gun. That's the specific case that Attorney Hutchinson represented [Warren] on. That he was with the defendant when he used the gun and that prior shooting for which the witness was arrested—Mr. Warren was apparently arrested, represented by Attorney Hutchinson, who represented him from November 29, 2011 to March 8, 2012. And, ultimately, resulting in a nolle on that date, March 8, 2012.

"So it is certainly a different circumstance from the testimony I heard during the course of the [probable

cause hearing]. Now claiming that this witness is a key witness connecting the weapon to the defendant, this defendant, and to the weapon used in the homicide, which means that Attorney Hutchinson would necessarily be in the compromised position at trial of cross-examining the state's key witness, her former client, about facts and circumstances that will encompass the incident in which she represented the witness. Involving the same gun alleged to have been used in both the homicide and the earlier shooting. Her goal would necessarily be to discredit the testimony of her prior client and she would have to accomplish that goal without jeopardizing privileged communications, privileged communication she received by Mr. Warren during the course of her representation of him. The problem—if this were an unrelated matter in which Attorney Hutchinson represented Mr. Warren, I think I again find the equities in favor of sustaining her appearance in this case on behalf of the defendant. But this is—this goes right to the heart of the trial. It goes to a key witness who she would have to cross-examine in connection with an incident where she actually represented the witness.

"So under the circumstances I am satisfied that despite the defendant's voluntary waiver of any conflict that the motion to disqualify Attorney Hutchinson has to be granted. I'm satisfied that it [affects] the very integrity of the trial. I think the integrity of the trial would be compromised by her continued representation in this case."

"[T]he sixth amendment right to counsel of choice . . . commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best." *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 146, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). "To overcome the presumption in favor of a defendant's choice of counsel, a disqualification decision by the trial court must, therefore, be based upon a reasoned determination on the basis of a fully prepared record . . . . Because the interest at stake is nothing less than a criminal defendant's sixth amendment right to counsel of his choice, the trial court cannot vitiate this right without first scrutinizing closely the basis for the claim. Only in this way can a criminal defendant's right to counsel of his choice be appropriately protected." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 265 Conn. 460, 474–75, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004).

Although it is generally structural error for a court to disqualify a defendant's attorney of choice, "the right to counsel of choice is circumscribed in several important respects. . . . Significantly, a defendant may not insist on representation by an attorney he can-

not afford or who for other reasons declines to represent the defendant. . . . [T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them. . . . Nor may a defendant insist on representation by a person who is not a member of the bar, *or demand that a court honor his waiver of conflict-free representation*. . . . We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar . . . . The court has, moreover, an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Peeler*, 320 Conn. 567, 579, 133 A.3d 864, cert. denied, U.S. , 137 S. Ct. 110, 196 L. Ed. 2d 89 (2016).

Although "[a]n attorney [facing a possible conflict] in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial"; (emphasis omitted; internal quotation marks omitted) *State* v. *Crespo*, 246 Conn. 665, 696, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999), quoting *Cuyler* v. *Sullivan*, 446 U.S. 335, 347, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); see *Willis* v. *United States*, 614 F.2d 1200, 1206 (9th Cir. 1980); this consideration does not "[transfer] to defense counsel the authority of the trial judge to rule on the existence or risk of a conflict . . . ." (Internal quotation marks omitted.) *State* v. *Cruz*, 41 Conn. App. 809, 814, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996), quoting *Holloway* v. *Arkansas*, 435 U.S. 475, 486, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978). "When a defendant's selection of counsel seriously endangers the prospect of a fair trial, a trial court justifiably may refuse to agree to the choice. Thus, a trial court may, in certain situations, reject a defendant's choice of counsel on the ground of a potential conflict of interest, because a serious conflict may indeed destroy the integrity of the trial process." *State* v. *Peeler*, supra, 265 Conn. 473. "There are many situations in which a . . . court can determine that disqualification of counsel is necessary. The most typical is where the . . . court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation . . . or because of the counsel's prior representation of a witness or co-defendant . . . ." (Internal quotation marks omitted.) *State* v. *Crocker*, 83 Conn. App. 615, 627, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), quoting *United States* v. *Locascio*, 6 F.3d 924, 931 (2d Cir. 1993).

"[A trial] court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight

after the trial has taken place, but in the murkier pretrial context when relationships between the parties are seen through a glass, darkly. . . . [T]he [trial] court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat* v. *United States*, 486 U.S. 153, 162–63, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

Indigent defendants are entitled to the appointment of adequate, competent counsel with undivided loyalty. Indigent defendants, however, have no right to select appointed counsel. Arbitrary denial of appointed counsel can be a due process violation. In situations in which trial courts in other states have changed counsel appointed for indigent defendants over the wishes of the defendants, it has been held to be the trial court's duty to protect the defendant's right to effective counsel while balancing the defendant's right to retain the counsel he prefers. See *McKinnon* v. *State*, 526 P.2d 18, 22 (Alaska 1974); *Smith* v. *Superior Court of Los Angeles County*, 68 Cal. 2d 547, 559, 440 P.2d 65, 68 Cal. Rptr. 1 (1968). We agree with the California Supreme Court, which stated: "[O]nce counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused." *Smith* v. *Superior Court of Los Angeles County*, supra, 562; accord *Stearnes* v. *Clinton*, 780 S.W.2d 216, 221–22 (Tex. Crim. App. 1989). Factors that have been found *not* to outweigh an indigent defendant's right to continued representation by his appointed counsel include the judge's subjective opinion that the counsel is " 'incompetent' " because of ignorance of the law to try the case before him; *Smith* v. *Superior Court of Los Angeles County*, supra, 549; a judge's view that there was an inexcusable lack of preparation by the public defender's office; *McKinnon* v. *State*, supra, 21; and mere disagreement by the trial judge as to the conduct of the defense. *Harling* v. *United States*, 387 A.2d 1101, 1105 (D.C. App. 1978).

A court may, however, change a defendant's appointed counsel for a nonarbitrary reason. Factors that have been found to outweigh an indigent defendant's right to continued representation by appointed counsel include a potential conflict of interest because a defendant's appointed attorney previously represented a person whom the defense suspected of committing the murder of which the defendant was accused, notwithstanding the defendant's offer to waive the potential conflict; *People* v. *Jones*, 33 Cal. 4th 234, 240–

42, 91 P.3d 939, 14 Cal. Rptr. 3d 579 (2004); and a potential conflict of interest that a trial court refused to allow a defendant to waive where the public defender whose office was representing the defendant was also representing a witness the state possibly intended to call in the case against the defendant. *People* v. *Moore*, 71 Ill. App. 3d 451, 453–54, 389 N.E.2d 944 (1979).

In support of disqualifying Hutchinson, the state argued that an actual conflict existed between her representation of the defendant and her ability to cross-examine Warren during any of the proceedings in the case. She represented Warren on a shooting charge, and, at the time this issue arose, the court reasonably believed that Warren would testify that the firearm from that shooting belonged to the defendant and was used in the murder of the victim.

The defendant argues on appeal that there was no reason to disqualify Hutchinson because after reviewing the discovery from the state and listening to the state's oral representations, Hutchinson did not believe she had a conflict of interest; that he was properly canvassed about any potential conflict of interest and expressly waived it; and that the state did not ask the witness, Warren, about the incident that allegedly gave rise to the conflict of interest either at the probable cause hearing or at trial.

The court determined that Hutchinson's potential conflict of interest risked compromising the integrity of the trial if she continued to represent the defendant in this matter and thus granted the state's motion to disqualify her. In light of the great difficulty Hutchinson could have experienced in cross-examining Warren without violating *his* rights, we cannot find that the court abused its discretion in concluding that her removal as the defendant's counsel was essential to protect the integrity of the trial. The state represented to the court that Warren would be providing key testimony regarding the firearm used in the robbery that was unavailable from any other witness, and the court relied on this representation as presenting a likely and substantial conflict. The fact that Warren did not later testify about the defendant's use of the firearm in question cannot be considered now because the court could not have known that at the time that it ruled on the motion to disqualify. Disqualifying Hutchinson, moreover, cannot be found to have prejudiced the defendant because no reason has been advanced as to why the defendant specially needed her personal services as a lawyer, and fully twenty months remained after her disqualification before the start of the defendant's trial. In sum, we conclude that the court did not abuse its discretion by granting the state's motion to disqualify.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed.

1489 (1946). "[U]nder the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did *not* commit if the state can establish that a coconspirator *did* commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy." (Emphasis in original.) *State* v. *Patterson*, 276 Conn. 452, 483, 886 A.2d 777 (2005).

[2] The defendant was also found guilty of felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), hindering prosecution in the second degree in violation of General Statutes § 53a-166, and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).

At sentencing, the court vacated its finding of guilt as to the charges of felony murder and attempted robbery in the first degree. The defendant does not contest his conviction of hindering prosecution in the second degree or tampering with physical evidence. The defendant was acquitted of conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a (a).

[3] Although Walker was tried in a separate trial, the court refers to him as the defendant's codefendant.

[4] We note that the court variously referred to Walker as "Gutter" or "Gudda." For clarity, this opinion will refer to him as Walker.

[5] The court found that the phone call that occurred when the victim was in the shower took place on May 12, 2012. The record reflects, however, that this call took place two or three days prior.

[6] The trial court did not identify Son. The phone was later identified as belonging to the victim.

[7] "Epic" refers to the name of a store in a shopping mall.

[8] See footnote 1 of this opinion. (A defendant cannot be found guilty of murder under doctrine of *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 [1946], if there was no conspiracy to commit a robbery.)

_____