******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* NIRAJ PRABHAKAR PATEL
## (AC 40605)

Sheldon, Keller and Bright, Js.

*Syllabus*

Convicted of the crimes of felony murder, home invasion as an accessory, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree and hindering prosecution in the second degree in connection with the shooting death of the victim, the defendant appealed. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's motion for a continuance, which was made due to the fact that the defendant was experiencing, among other things, laryngitis and coughing, when he was scheduled to testify on his own behalf; the facts in the record, which were known to the trial court at the time of the defendant's request, demonstrated that the defendant had requested multiple continuances, that the defendant's physician testified that the defendant was medically able to testify via microphone, that the court was aware that the defendant had been working at his family's business and speaking with customers in the interim, and that the court had made adjustments to its amplification system in the courtroom to assist the jury in better hearing the defendant and others.

2. The trial court did not abuse its discretion in denying the defendant's motions for a mistrial, which the defendant made during and immediately after his testimony because the jury had informed the court that it could not hear him; although the jury initially may have had trouble hearing the defendant due, in part, to problems with the court's amplification system, the jury properly notified the court, which took immediate corrective action, including having the previous testimony read back to the jury in its entirety, permitting counsel to offer corrections to the testimony that was read back, and correcting the problem with the amplification system, it was clear from the record that the jury heard the defendant's testimony through the court's correction of its amplification system or when the testimony was read back, and was able to observe the defendant's demeanor while testifying, and defense counsel made a strategic choice not to ask the defendant to reanswer questions the jury originally had difficulty hearing.

3. The defendant could not prevail on his claim that the trial court improperly admitted into evidence as statements against penal interest a jailhouse recording of a confidential informant and one of his coconspirators, C, who was the informant's cellmate, which was based on his claim that the statements made in the recording were testimonial in nature and were not trustworthy or reliable: C's statements to the informant, which implicated the defendant, bore none of the characteristics of testimonial hearsay, as C made the statements to his prison cellmate in an informal setting, he implicated himself and two others, and there was no indication that he anticipated that his statements would be used in a criminal investigation or prosecution, and, therefore, the trial court did not violate the defendant's right to confrontation by admitting the recording into evidence; moreover, the defendant's claim that the statements were not trustworthy or reliable was not reviewable, as the trial court denied the defendant's motion in limine to exclude the recording without prejudice and specifically told defense counsel that its ruling was not final and that defense counsel could question the cellmate outside the presence of the jury, through which defense counsel could have developed the record further and attempted to establish that the recording was untrustworthy or unreliable, but defense counsel did not do so, nor did defense counsel object at the time the recording was offered into evidence, and, therefore, the claim was not preserved for appellate review.

4. The trial court did not abuse its discretion in preventing the defendant from asking certain questions to potential jurors during voir dire regarding the death penalty as a means of exploring potential racial biases in jurors and whether jurors could keep an open mind through the end of

the trial, including the questioning of the final witness, whom the defendant claimed in many cases is the most important witness: the questions regarding the death penalty could have been misleading and confusing to a potential juror, the record revealed that defense counsel was given wide latitude in questioning potential jurors regarding their ability to be fair and impartial and to follow the law, the trial court never imposed any prohibition on defense counsel's ability to explore potential racial bias or prejudices, and defense counsel chose not to engage in such exploration; moreover, the defendant's proffered question regarding the final witness presented had the potential to plant prejudicial matter in the minds of the jurors and might have caused the potential jurors to assume that the final witness was special or more important than other witnesses.

5. The defendant's claim that the trial court erred in giving a certain limiting instruction to the jury regarding nonhearsay testimony and that such instruction impacted his right to testify in his own defense by affecting his credibility was not reviewable; the defendant specifically having voiced agreement with the trial court's statement that it would give a limiting instruction and, thereafter, having failed to object to the precise instruction given by the court, the claim of instructional error was unpreserved, and because the claim was evidentiary in nature, it was not reviewable pursuant to *State* v. *Golding* (213 Conn. 233).

Argued September 21, 2018—officially released January 8, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, home invasion as an accessory, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree, conspiracy to commit robbery in the first degree, and hindering prosecution in the second degree, brought to the Superior Court in the judicial district of Litchfield and tried to the jury before *Danaher, J.*; verdict and judgment of guilty; thereafter, the court vacated the defendant's conviction of murder and conspiracy to commit robbery in the first degree, and the defendant appealed. *Affirmed.*

*Hubert J. Santos*, with whom was *Trent A. LaLima*, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *Dawn Gallo*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Niraj Prabhakar Patel, appeals from the judgment of conviction of felony murder in violation of General Statutes (Rev. to 2011) § 53a-54c, home invasion as an accessory in violation of General Statutes §§ 53a-100aa (a) (1) and 53a-8 (a) and (b), home invasion as an accessory in violation of §§ 53a-100aa (a) (2) and 53a-8 (b), burglary in the first degree as an accessory in violation of General Statutes §§ 53a-101 (a) (1) and 53a-8 (a) and (b), robbery in the first degree as an accessory in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8 (a) and (b), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (1) and 53a-48, and hindering prosecution in the second degree in violation of General Statutes § 53a-166.[1] On appeal, the defendant claims that the trial court erred in (1) denying his motion for a continuance, (2) denying his motions for a mistrial, (3) admitting into evidence the jailhouse recording between a confidential informant and Michael Calabrese, one of the defendant's coconspirators, (4) preventing him from asking certain questions to potential jurors during voir dire, and (5) giving an improper limiting instruction to the jury regarding nonhearsay testimony. We affirm the judgment of the trial court.

The following facts reasonably could have been found by the jury. On June 12, 2012, the defendant was arrested by the Torrington police following a traffic stop. In his vehicle, the police discovered a black duffle bag containing, among other things, marijuana and $12,375 in cash. The defendant, thereafter, needed money to retain a lawyer and to pay the person to whom he owed the $12,375 that the police had confiscated. The defendant searched for legal loans, fast cash loans, and cash advances, to no avail. He also, unsuccessfully, attempted to borrow money from family members. When these efforts failed, the defendant enlisted the help of his cousin, Hiral Patel (Patel), and his friend, Calabrese. The defendant concocted a plan to rob another friend, Luke Vitalis, who was a marijuana dealer. Calabrese agreed to help the defendant because the defendant led him to believe that Vitalis owed money to the defendant, and that the robbery was a way to obtain the money that Vitalis owed. The defendant also led Calabrese to believe that he and the defendant would split the proceeds from the robbery.

The defendant learned that Vitalis was going to sell $29,000 worth of marijuana to a client and that the sale was to occur on the evening of August 5, 2012, at Vitalis' home, located in Sharon. The defendant then set up his own purchase from Vitalis for the following evening, with the intention of robbing him of those proceeds. On August 6, 2012, the defendant drove Patel and Calabrese to the vicinity of Vitalis' home. Calabrese was armed with a loaded .40 caliber Ruger handgun, which

the defendant had given to him.

Patel and Calabrese watched the home for a while, and, then, at approximately 6 p.m., they covered their faces with masks and put on black hats and gloves, before entering the home and declaring that it was a home invasion. Vitalis' mother was in the home, and Patel and Calabrese tied her hands, as she begged them not to hurt or kill her son. Calabrese then went upstairs, struck Vitalis with the Ruger, and shot him three times, killing him and leaving "chunks of . . . brain . . . all over the wall." Calabrese could hear Vitalis' mother screaming. Calabrese, soaked in blood, then searched for Vitalis' money, but was able to find only $70 and approximately one-half ounce of marijuana, both of which he took. Patel and Calabrese then fled the scene, leaving a bloody footprint behind. As they left the house, one of them was on a cell phone, and Vitalis' mother heard him saying "hurry up, hurry the fuck up."

Vitalis' mother was able to free herself, and she called 911. After the police arrived, they went upstairs and found Vitalis' body. The police searched the ransacked room and discovered an empty Pioneer speaker box. In total, the police found $32,150 in the bedroom, and they discovered .40 caliber shell casings. They also found a large quantity of marijuana in the home. After the police had arrived at Vitalis' home, the defendant, in an effort to mislead the police, sent a text message to Vitalis' cell phone saying that he was on his way and would be at Vitalis' home in approximately forty-five minutes.

Eventually Patel and Calabrese met up with the defendant. Calabrese thereafter burned his clothing and his sneakers, which police later discovered, enabling them to match the print of the sneaker to that of the bloody footprint left at the scene of the murder. Calabrese also disposed of the Ruger, which never was found. Later, the defendant attempted to dispose of a bulletproof vest, a Ruger pistol box, a magazine, and a shotgun, leaving the items with relatives in New York City and repeatedly requesting that his cousin dispose of the items in different locations.[2]

On September 11, 2013, the state police arrested the defendant. Following a trial, the jury, on February 4, 2016, returned a verdict of guilty on all counts. Specifically, the jury found the defendant guilty of felony murder, murder under the *Pinkerton* doctrine,[3] two counts of home invasion as an accessory, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree, conspiracy to commit robbery in the first degree, and hindering prosecution in the second degree. The court, thereafter, rendered judgment in accordance with the jury's verdict. See footnote 1 of this opinion. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant claims that the court abused its discretion in denying his motion for a continuance, which was made because the defendant was experiencing, among other things, laryngitis and coughing, when he was scheduled to testify on his own behalf. The defendant argues that his request was reasonable, supported by his affidavit and the note and testimony of his physician, and would have involved only a one day delay in the presentation of evidence in a case that was well ahead of schedule. He contends that this alleged error was harmful because it placed him in a bad light before the jury, which was not able to get an accurate impression of him in order to assess his credibility. The state argues that the court acted well within its discretion in denying another continuance in this matter, especially in light of the fact that the defendant had gone to work at his family's business and there was no guarantee that his laryngitis would have been better with this delay. We conclude that the court acted well within its discretion.

The following additional facts inform our review of this claim. The prosecution rested its case on Wednesday, January 20, 2016. The defendant then requested a continuance to Tuesday, January 26, 2016. The court granted the request. Over the weekend, however, the defendant became ill, and was coughing, vomiting, and experiencing trouble speaking. Defense counsel notified the court, presented a note from the defendant's physician, and requested a continuance to Friday, January 29, 2016. The court considered the request, granted a further continuance to Wednesday, January 27, 2016, and told defense counsel that he could present witnesses other than the defendant on that day, thereby giving the defendant another day to recuperate before testifying.

On January 28, 2016, the defendant still was experiencing laryngitis and coughing, with the ability to speak only in a low voice. His attorney requested a continuance until Tuesday, February 2, 2016. The prosecution argued that the defendant had been seen working at his family's business in the preceding days and that the continuance should not be granted. Defense counsel conceded that the defendant had been at the family's business but argued that this was quite different from testifying in court while experiencing fits of coughing and having laryngitis. Counsel also argued that to make the defendant testify while his health and voice were compromised would violate his rights under both the state and federal constitutions.

Later that day, the state presented the testimony of the defendant's physician, who opined that the defendant was ill. The physician also stated that he had given the defendant a prescription on Monday, January 25,

2016. He further indicated that with this medication, the defendant should be able to testify approximately seventy-two hours after beginning the medication. He specifically confirmed that if the defendant had started his prescription on Tuesday, he would be ready to testify on Friday, January 29. He further testified that the defendant had not called his office for a follow-up visit and had not indicated to him that the defendant's condition had worsened. On cross-examination, the physician testified that when he told the defendant on Monday to take seventy-two hours off, that meant that the defendant was not supposed to work. When asked if he would recommend that the defendant take more time off, he answered "[n]o."

Defense counsel also had the defendant speak his name and address so the physician could hear the quality of the defendant's voice. After listening to the defendant, the physician further opined that the defendant was medically able to testify with a microphone. The court denied the requested continuance, noting that it would use the microphone amplification system and "turn it up as high as we need to," when the defendant testified on Friday, January 29, 2016. Defense counsel then requested permission to make a record and argued that the court's ruling interfered with the defendant's right to testify under both the state and federal constitutions. In response, the state noted that it already had its rebuttal witnesses make accommodations and that they were on standby. The court then restated its ruling that the defendant would testify the next day, noting that (1) the defendant had contributed to his own problem by not following medical advice when he returned to work earlier in the week, (2) the defendant's physician had testified that the defendant could testify, and (3) the court had an amplification system to project the defendant's voice.

The defendant argues that the court abused its discretion when it denied his request for a continuance. Although he suggests that the court's ruling under these circumstances implicates his right to testify under the federal and state constitutions, he has not made a freestanding constitutional claim. Instead he has briefed the claim under only the abuse of discretion standard using the *Hamilton* factors. See *State* v. *Hamilton*, 228 Conn. 234, 240–41, 636 A.2d 760 (1994). Applying those factors, we conclude that the court did not abuse its discretion.

"[T]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances . . . ." (Internal quotation marks omitted.) *State* v. *Bush*, 325

Conn. 272, 316, 157 A.3d 586 (2017).

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . .

"In appellate review of matters of continuances, federal and state courts have identified multiple factors that appropriately may enter into the trial court's exercise of its discretion. Although the applicable factors cannot be exhaustively catalogued, they generally fall into two categories. One set of factors focuses on the facts of record before the trial court at the time when it rendered its decision. From this perspective, courts have considered matters such as: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; the likelihood that the denial would substantially impair the defendant's ability to defend himself; the availability of other, adequately equipped and prepared counsel to try the case; and the adequacy of the representation already being afforded to the defendant. . . . Another set of factors has included, as part of the inquiry into a possible abuse of discretion, a consideration of the prejudice that the defendant actually suffered by reason of the denial of the motion for continuance." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Hamilton*, supra, 228 Conn. 240–41; see *State* v. *Bush*, supra, 325 Conn. 316–17.

In this matter, the facts of record before the trial court at the time it rendered its decision were the following. The request for an additional continuance came during the evidentiary portion of the trial. The prosecution rested on January 20, 2016, after having presented more than thirty witnesses over a two week period, and the court granted the defendant a continuance to January 26, 2016. On January 26, the defendant requested another continuance, this time due to his illness, to Friday, January 29, 2016. The court granted another continuance but only until Wednesday, January 27, 2016, and it told the defendant that he could present witnesses other than himself on that date, thereby giving him the additional day to recover that he had requested.

On January 28, the defendant, still coughing and asserting that he was having trouble speaking, requested another continuance to Tuesday, February 2, 2016, with no guarantees that he would recover by that date or that his voice would be back to normal; defense counsel stated that he "hope[d]" the defendant's voice would be better by then. Moreover, the defendant's physician testified that the defendant was medically able to testify with a microphone, despite his illness. Additionally, the court was aware that the defendant had been working at his family's business and speaking with customers, although the defendant was arguing that he was not fit to testify because of illness, and his attorney had believed that he was home resting during that time. To assist the jury in better hearing the defendant and others, the court also instructed that the amplification system be turned up as loud as needed. On the basis of these facts, which were known to the trial court at the time of the defendant's request for a continuance, we conclude that the trial court did not abuse its discretion in denying the defendant's request.[4]

## II

The defendant claims that the court erred in denying his motions for a mistrial, made during and immediately after his testimony, because the jury had informed the court that it could not clearly hear the defendant. The defendant argues: "When the jury informed the court [that] it could not hear [the defendant], he had already testified about all of the conduct that may encompass all of the crimes except hindering prosecution. The court was also aware that the credibility of [the defendant's] testimony was the crucial question, and a jury that credit[s] [the defendant's testimony] must acquit on all charges except, possibly, hindering prosecution. . . . [Although] the court was in a difficult position after the jury's note, this position had no possible remedies to restore [the defendant's right to a] fair trial." We are not persuaded.

The following additional facts are necessary to our consideration of this claim. The day after the court had denied the defendant's motion for another continuance, he was called to testify. The defendant explained to the jury that he had bronchitis and laryngitis, and that this was affecting his voice. Several times during his testimony, the defendant was asked to repeat his answers and move closer to the microphone. The defendant testified about the events that had occurred before the crimes of which he was accused, ending at the point where he had dropped off Patel and Calabrese at Vitalis' home. See footnote 2 of this opinion. The jury then was excused for its morning break, and it sent a note to the court stating that it was having trouble hearing the defendant. The defendant requested that the court poll the jury to see how many of them did not hear his

testimony, and to ascertain what they did not hear, and he requested that the court declare a mistrial. The state objected to the defendant's request, noting that at other points during the trial, jurors had raised their hands and asked for testimony to be repeated when they did not hear it, and that this had not occurred during the defendant's testimony. The state also noted that defense counsel could take the defendant through his testimony again if counsel thought it was appropriate to do so.

The court denied both the request to poll the jury and the defendant's motion for a mistrial. At the request of the jury, the defendant's previous testimony thereafter was read to the jury. The court also repositioned the defendant's microphone, placed the speaker directly in front of the jury, and instructed the jurors that if any one of them had any further difficulty hearing testimony, she or he should immediately notify the court by raising her or his hand. The defendant's live testimony then continued. Almost immediately, one or more jurors raised his or her hand, and the amplification system again was adjusted. No subsequent problems were recorded. Following the defendant's testimony, he again moved for a mistrial, which the court denied. The defendant claims the court committed error by denying his motions for a mistrial. We disagree.

"[T]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . .

"In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 628, 175 A.3d 514 (2018).

Although the defendant's voice may have been low

and the jury initially may have had trouble hearing him due, at least in part, to problems with the court's amplification system,[5] the jury properly notified the court, which took immediate corrective action. The court had the previous testimony read to the jury in its entirety, and counsel was permitted to offer corrections to the read back. The court also adjusted the defendant's microphone, the speakers, and the amplification system. The court told the jury to notify it immediately if there was any further difficulty hearing testimony, and, almost immediately, such notification was given to the court, which took further corrective action, and the jury, again, was instructed to notify the court if any further problems were encountered. The defendant then resumed his testimony, with no further problems.

We readily acknowledge the defendant's concern that the jury was required to assess his credibility and that its ability to do so could be compromised if it was unable to hear him. The shortcoming of the defendant's argument, however, is that the court corrected the problem with the amplification system, had the testimony read to the jury, and gave counsel an opportunity to offer any corrections to the testimony that was read back, and the defendant resumed his live testimony. Had defense counsel thought it crucial that the jury hear the missed testimony live, directly from the defendant, rather than read back, he could have reinquired of the defendant or asked the court to strike the prior testimony that the jury did not hear and allow him to begin anew.[6] He chose not to do so. It is clear from the record that the jury heard the defendant's testimony, either live or by virtue of its being read, and was able to observe the defendant's demeanor while testifying,[7] and that defense counsel made a strategic choice not to ask the defendant to reanswer the questions that the jury originally had difficulty hearing. On this basis, we conclude that the court did not abuse its discretion in denying the defendant's motions for a mistrial.[8]

### III

The defendant next claims that the trial court erred in admitting into evidence, as statements against penal interest under § 8-6 (4) of the Connecticut Code of Evidence, (1) the jailhouse recording of a confidential informant and Calabrese, the informant's cellmate, and (2) the testimony of Calabrese's former girlfriend, Britney Colwell, who testified to statements made by Calabrese that implicated the defendant. The defendant first argues that by admitting the jailhouse recording into evidence, the court violated his right to confrontation.[9] He contends that Calabrese's statements were testimonial in nature, and, even if they were not testimonial, they failed to meet the requirements of the Connecticut Code of Evidence because they were not trustworthy or reliable. The defendant argues that Calabrese's statements to Colwell were unreliable and not against Cala-

brese's penal interest. The state argues that Calabrese's statements in the jailhouse recording were not testimonial in nature and that their admission into evidence, therefore, did not violate the defendant's right to confrontation. Additionally, the state argues that, as an evidentiary matter, the defendant's claim is not reviewable, but, to the extent that we deem it reviewable, the statements in the jailhouse recording were both trustworthy and reliable as dual inculpatory statements and that their admission, therefore, did not violate the Connecticut Code of Evidence. We agree with the state.[10]

The following additional facts inform our review. After Calabrese was arrested, he and his cellmate were talking about the charges that were pending against them. Thereafter, the cellmate approached a security officer and offered to record Calabrese. The cellmate was set up with a recording device, and he recorded his conversation with Calabrese, who was unaware that he was being recorded. Calabrese told his cellmate about the events surrounding Vitalis' killing, implicating himself, Patel, and the defendant.

The defendant filed a motion in limine seeking to exclude the jailhouse recording of Calabrese and his cellmate, alleging that the admission of this recording would be in violation of the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution, Article I, §§ 8, 9, and 10 of the Connecticut constitution, and § 42-15 of the Practice Book. The court denied the motion *without prejudice*, explaining that it did not consider the issue to be final and that it also would permit the defendant, out of the presence of the jury, to question the cellmate about the recording before the cellmate testified to the jury. The defendant has not pointed us to anything in the record that indicates that the defendant opted to pursue such questioning.

On the morning that the cellmate was scheduled to testify, the prosecutor notified the court and defense counsel that it had received a letter from Calabrese's attorney stating that Calabrese would invoke his fifth amendment privilege against self-incrimination if called to testify at the defendant's criminal trial and that his attorney would instruct him to remain silent. The following colloquy then occurred:

"[The Prosecutor]: I had discussions with Your Honor and defense counsel on a date prior to today in anticipation of [the cellmate's] testimony, and I believe that we had agreed in chambers that a representation made by way of letter from [Calabrese's attorney] on behalf of his client would suffice insofar as the foundation necessary for the dual inculpatory statement's admission.

"The Court: All right. Is . . . the record you just made sufficient for your purposes or do you want to mark the letter as an exhibit?

"[The Prosecutor]: I would like to mark it, please, for ID, Your Honor.

"The Court: All right, marked for ID only. That will be state's exhibit—

"The Clerk: Thirty-seven.

"The Court: Anything from the defense?

"[Defense Counsel]: No, Your Honor."

When the cellmate was called to testify at the defendant's trial, he admitted that he had a cooperation agreement with the state that provided that if he testified honestly and truthfully that the state, in the future, would notify the court of his cooperation. The prosecutor then questioned him about his offer to record Calabrese, and moved to admit the recording as a full exhibit. Defense counsel specifically stated that he had "[n]o objection." The prosecutor then moved to admit into evidence transcripts of the recording. When the court asked defense counsel if he had any objection, defense counsel responded: "No." The court instructed the jury that the transcripts were to assist them, but that they should rely on their understanding of the recording, and that if they believed something in the transcript differed from what they heard in the recording, the recording would control. The prosecutor then played the recording for the jury. Shortly thereafter, defense counsel began his cross-examination. Redirect by the prosecutor and recross by defense counsel followed. After the cellmate was excused from the courtroom, the court asked the parties if there was anything further before they took a recess, and both the prosecutor and defense counsel said no.

The defendant now claims that the court violated his right to confrontation by admitting this recording into evidence because the statements made in the recording were testimonial in nature,[11] and, even if they were not testimonial in nature, they failed to meet the requirements of the Connecticut Code of Evidence because they were not trustworthy or reliable. We consider each argument in turn.

A

Whether the Statements were Testimonial

"Under *Crawford* v. *Washington*, [541 U.S. 36, 68–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence. . . . Thus, the threshold inquiry for purposes of the admissibility of such statements under the confronta-

tion clause is whether they are testimonial in nature." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 564 n.14, 78 A.3d 828 (2013). "Because this determination is a question of law, our review is plenary." *State* v. *Madigosky*, 291 Conn. 28, 44, 966 A.2d 730 (2009).

"In *Crawford*, the Supreme Court declined to spell out a comprehensive definition of testimonial . . . . Instead, the court defined a testimonial statement in general terms: A solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . The court did note, however, three formulations of th[e] core class of testimonial statements . . . [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Internal quotation marks omitted.) Id., 44–45.

"Subsequently, in *Davis* v. *Washington*, [547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)], the United States Supreme Court elaborated on the third category and applied a 'primary purpose' test to distinguish testimonial from nontestimonial statements given to police officials, holding: 'Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' In *Davis*, the court held that statements given to a 911 operator while an emergency was unfolding were nontestimonial and could be admitted because they were given for the primary purpose of responding to the emergency. . . . In contrast, statements given in an affidavit following a 911 telephone call to a police officer were testimonial and therefore inadmissible because they were provided to the officer after the emergency had passed for the primary purpose of developing evidence against an accused. . . .

"In *State* v. *Slater*, [285 Conn. 162, 172 n.8, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008)], we reconciled *Crawford* and *Davis*, noting: 'We view the primary purpose gloss articulated in *Davis* as entirely consistent with *Crawford*'s focus

on the reasonable expectation of the declarant. . . . [I]n focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution.' . . . We further emphasized that 'this expectation must be reasonable under the circumstances and not some subjective or far-fetched, hypothetical expectation that takes the reasoning in *Crawford* and *Davis* to its logical extreme.' " (Citations omitted.) *State* v. *Smith*, 289 Conn. 598, 623–24, 960 A.2d 993 (2008).

The defendant contends that "there was no ongoing emergency [and] the entire purpose behind correction officers having [the cellmate] make the recording of Calabrese was to obtain evidence against him and others for later prosecution. . . . An objective witness in Calabrese's position, as an incarcerated person, should have reasonably expected that anything he said about his crimes to another inmate . . . could be later relayed and used at a trial. An objective person would not reasonably trust a person he just met with the details of a murder without suspecting his words may later haunt him." (Citations omitted; footnote omitted.) He further contends that "[t]he relevant inquiry is not based upon Calabrese's subjective beliefs but, rather, that of an objective, reasonable witness under similar circumstances."

The state responds that an objective witness would not expect his statements to his cellmate to be recorded and used against him or his coconspirator. Additionally, the state argues, "[m]oreover, post-*Crawford*, the majority of federal courts have held that dual inculpatory or coconspirator statements made by one prisoner to another, even when one of the prisoners is a confidential informant for law enforcement, are nontestimonial and these courts have done so after analyzing the question from the perspective of the declarant.[12]" We agree with the state.

It does not appear as though our Supreme Court has addressed the specific issue of whether a recording initiated by a prisoner, who is acting as a confidential informant, of a fellow prisoner unwittingly making dual inculpatory statements about himself and a coconspirator or codefendant are testimonial in nature. After reviewing relevant case law, we conclude that Calabrese's statements at issue in the present case are nontestimonial in nature.

In *Davis*, the Supreme Court indicated that statements made unwittingly to a government informant, or statements made from one prisoner to another, "were clearly nontestimonial." *Davis* v. *Washington*, supra, 547 U.S. 825 ("Where our cases . . . dispense[d] with

[the confrontation clause requirements of unavailability and prior cross-examination in cases that involved testimonial hearsay]—even under the [pre-*Crawford*] approach—the statements at issue were clearly nontestimonial. See, e.g., *Bourjaily* v. *United States*, 483 U.S. 171, 181–184[,] [107 S. Ct. 2775, 97 L. Ed. 2d 144] [1987] [statements made unwittingly to a Government informant]; *Dutton* v. *Evans*, 400 U.S. 74, 87–89[,] [91 S. Ct. 210, 27 L. Ed. 2d 213] [1970] [plurality opinion] [statements from one prisoner to another].").

In *United States* v. *Saget*, 377 F.3d 223, 228 (2d Cir. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 938, 160 L. Ed. 2d 821 (2005),[13] then Judge Sotomayor explained in a unanimous decision that "[a]lthough [the Supreme Court in *Crawford*] declined to spell out a comprehensive definition of testimonial . . . it provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations. . . . With respect to the last example, the Court observed that [a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . Thus, the types of statements cited by the Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." (Citations omitted; internal quotation marks omitted.)

The court further opined, "*Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the *declarant's awareness or expectation* that his or her statements may later be used at a trial. [*Crawford*] lists several formulations of the types of statements that are included in the core class of testimonial statements, such as 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' . . . All of these definitions provide that the statement must be such that the *declarant reasonably expects* that the statement might be used in future judicial proceedings. . . . Although the Court [in *Crawford*] did not adopt any one of these formulations, its statement that '[t]hese formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it' suggests that the Court would use the reasonable expectation *of the declarant* as the anchor of a more concrete definition of testimony." (Citations omitted; emphasis added; footnote omitted.) Id., 228–29; see also *State* v. *Miller*, 95 Conn. App. 362, 382, 896 A.2d 844 (discussing *Saget*), cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006).

In *Saget*, it was undisputed that the coconspirator of the defendant had no knowledge that he was speaking with a confidential informant. *United States* v. *Saget*, supra, 377 F.3d 229. The court stated that, in light of this, it would not "attempt to articulate a complete definition of testimonial statements in order to hold that [the coconspirator's] statements did not constitute testimony . . . because *Crawford* indicates that the specific type of statements at issue here are nontestimonial in nature." Id.

The court in *Saget* went on to discuss the Supreme Court's decision in *Bourjaily* v. *United States*, supra, 483 U.S. 171, which it found relevant. *United States* v. *Saget*, supra, 377 F.3d 229. It explained, *Bourjaily* "involved a co-defendant's unwitting statements to an FBI informant, as an example of a case in which nontestimonial statements were correctly admitted against the defendant without a prior opportunity for cross-examination. . . . In *Bourjaily*, the declarant's conversation with a confidential informant, in which he implicated the defendant, was recorded without the declarant's knowledge. . . . The Court held that even though the defendant had no opportunity to cross-examine the declarant at the time that he made the statements and the declarant was unavailable to testify at trial, the admission of the declarant's statements against the defendant did not violate the Confrontation Clause. . . . *Crawford* approved of this holding, citing it as an example of an earlier case that was consistent with the principle that the Clause permits the admission of nontestimonial statements in the absence of a prior opportunity for cross-examination." (Citations omitted; internal quotation marks omitted.) Id.

In reliance on *Crawford* and *Bourjaily*, the court in *Saget* firmly held that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*." Id.; accord *United States* v. *Dargan*, 738 F.3d 643, 650–51 (4th Cir. 2013) (statements made by coconspirator of defendant to cellmate in informal setting were "plainly nontestimonial" under *Davis* and *Crawford*); *United States* v. *Pelletier*, 666 F.3d 1, 9 (1st Cir. 2011) ("Although we have not previously had occasion to apply *Davis* to the situation presented here—statements made by one inmate to another—we have little difficulty holding that such statements are not testimonial. . . . [The declarant's] jailhouse statements to [his fellow inmate] bear none of the characteristics of testimonial hearsay. They were made not under formal circumstances, but rather to a fellow inmate with a shared history, under circumstances that did not portend their use at trial against [the defendant]." [Citations omitted.]), cert. denied, 566 U.S. 1023, 132 S. Ct. 2683, 183 L. Ed. 2d 48 (2012); *United States* v. *Smalls*, 605 F.3d 765, 778, 780 (10th Cir. 2010)

(accomplice declarant's recorded statement to confidential informant cellmate "unquestionably nontestimonial" because declarant "in no sense intended to bear testimony against [defendant]; [declarant] in no manner sought to establish facts for use in a criminal investigation or prosecution . . . [declarant] boasted of the *details* of a cold-blooded murder in response to 'casual questioning' by a fellow inmate and apparent friend" [citation omitted; emphasis in original]); *United States* v. *Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (declarant's dual inculpatory statements implicating himself and codefendants, unwittingly made to confidential jailhouse informant wearing wire, were nontestimonial), cert. denied, 560 U.S. 966, 130 S. Ct. 3409, 177 L. Ed. 2d 326 (2010); *United States* v. *Watson*, 525 F.3d 583, 589 (7th Cir. 2008) ("statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes"), cert. denied sub nom. *Redmond* v. *United States*, 555 U.S. 1037, 129 S. Ct. 610, 172 L. Ed. 2d 466 (2008), and cert. denied, 555 U.S. 1104, 129 S. Ct. 972, 173 L. Ed. 2d 117 (2009); *United States* v. *Udeozor*, 515 F.3d 260, 270 (4th Cir. 2008) (because defendant plainly did not think he was giving any sort of testimony when making statements to victim during recorded telephone calls, admission of taped conversations into evidence did not violate defendant's rights under confrontation clause).

In the present case, Calabrese's statements to his prison cellmate bear none of the characteristics of testimonial hearsay. Calabrese made these statements to his prison cellmate in an informal setting. He implicated himself, Patel, and the defendant, and there is no indication that he anticipated that his statements would be used in a criminal investigation or prosecution. Accordingly, we conclude that the trial court did not violate the defendant's right to confrontation by admitting into evidence the recording of Calabrese's statements.[14]

### B

### Whether Calabrese's Statements were Trustworthy or Reliable

The defendant contends that the court improperly admitted Calabrese's statements under § 8-6 (4) of the Connecticut Code of Evidence as statements against penal interest when they were not trustworthy or reliable. The state argues that, as an evidentiary matter, the defendant's claim is not reviewable because he failed to preserve his objection properly by reasserting it after his motion in limine was denied *without prejudice*. In the alternative, it argues that the statements were both trustworthy and reliable. We conclude that this claim is not reviewable because the defendant failed to preserve his objection.

As set forth in our statement of additional facts, in

ruling on the defendant's motion in limine to exclude Calabrese's statements, the court denied the motion *without prejudice* and specifically told defense counsel that its ruling was not final, and that defense counsel could question the cellmate outside of the presence of the jury, before he testified and before the recording was introduced into evidence. Defense counsel has not asserted on appeal that he took the opportunity to question the cellmate outside of the jury's presence. Additionally, the record clearly demonstrates that defense counsel did not object when the recording of the statements was offered into evidence. The record also reveals that defense counsel specifically agreed that the prosecutor had laid the necessary foundation for admission of the recording by his submission of a letter from Calabrese's attorney stating that Calabrese would invoke his fifth amendment privilege if called to testify.

Practice Book § 60-5 provides in relevant part: "In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, *and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling* thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same. . . ." (Emphasis added.)

"A trial court may entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. . . . The judicial authority may grant the relief sought in the motion or such other relief as it may deem appropriate, may deny the motion with or *without prejudice to its later renewal,* or may reserve decision thereon until a later time in the proceeding. Practice Book § 42-15. This court has said that [t]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial." (Emphasis added; internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80, 85, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001).

Our Supreme Court has stated: "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005). In particular,

where the court's evidentiary ruling is preliminary and not final, it is "incumbent on the defendant to seek a definitive ruling [when the evidence is offered at trial] in order fully to comply with the requirements of our court rules of practice for preserving his claim of error . . . ." *State* v. *Johnson*, 214 Conn. 161, 170, 571 A.2d 79 (1990).

We conclude that the defendant's claim is not reviewable. The court denied the defendant's motion in limine *without prejudice*, and specifically stated that its ruling *was not final*, in order to permit defense counsel the opportunity to question the cellmate out of the presence of the jury; defense counsel, through such questioning, would have had the opportunity to attempt to establish that the recording containing Calabrese's statement was untrustworthy or unreliable. The defendant specifically was permitted to make such a showing and to raise additional objections when the recording was introduced into evidence. This would have allowed the trial court to make a final ruling after the record was further developed by defense counsel and the court was in a better position to evaluate the circumstances surrounding the recording. Having not taken advantage of the court's offer and having not objected at the time the evidence was offered, the defendant has not preserved this evidentiary issue for appellate review.[15]

IV

The defendant also claims that the trial court erred in preventing him from asking certain questions to potential jurors during voir dire. Specifically, the defendant claims that the court abused its discretion in preventing him from questioning potential jurors regarding (1) their opinions on the death penalty and (2) whether they would keep an open mind throughout the trial, including when the final witness was questioned because "many times the most important witness is the last witness." The state contends that the court properly prohibited these questions on the ground that they raised irrelevant and improper matters. After setting forth our standard of review and the principles that guide us, we will consider each voir dire question in turn.

"Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f; Practice Book [§ 42-12]. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the

[prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause." (Internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 483, 102 A.3d 52 (2014).

"[I]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. . . . The latitude . . . afforded the parties in order that they may accomplish the purposes of the voir dire [however] is tempered by the rule that [q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venire[person] will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination. . . .

"Thus, we afford trial courts wide discretion in their supervision of voir dire proceedings to strike a proper balance between [the] competing considerations . . . but at the same time recognize that, as a practical matter, [v]oir dire that touches on the facts of the case should be discouraged." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Ebron*, 292 Conn. 656, 666–67, 975 A.2d 17 (2009), overruled on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011). "[T]he permissible content of the voir dire questions cannot be reduced to simplistic rules, but must be left fluid in order to accommodate the particular circumstances under which the trial is being conducted. Thus, a particular question may be appropriate under some circumstances but not under other circumstances. . . . The trial court has broad discretion to determine the latitude and the nature of the questioning that is reasonably necessary to search out potential prejudices of the jurors." (Citation omitted; internal quotation marks omitted.) *State* v. *Skipper*, 228 Conn. 610, 626–27, 637 A.2d 1101 (1994).

A

On October 26, 2015, the defendant filed a motion for permission to question prospective jurors about their views on the death penalty on the grounds that he wanted to evaluate whether jurors were defense or

prosecution oriented, and he wanted to "gauge [their] knowledge and awareness of current issues."[16] He asserted that he would inform the jury that this was not a death penalty case. The prosecutor objected, arguing, in part, that, since the death penalty is nonexistent in Connecticut, these types of questions would mislead and confuse the jury, which has no say in the defendant's punishment in any case. The prosecutor contended that there were many other ways that defense counsel could explore juror bias without injecting irrelevant and inappropriate matters into the case. The court denied the defendant's motion on the basis that the questions sought to inquire into whether prospective jurors were aware that the death penalty had been abolished, and an inquiry into a juror's knowledge of existing law was impermissible under *Duffy* v. *Carroll*, 137 Conn. 51, 56–57, 75 A.2d 33 (1950) ("Neither is a juror's knowledge or ignorance concerning questions of law a proper subject of inquiry. These are concerned with matters which the juror is bound to take from the court. A juror cannot be a law to himself, but is bound to follow the instructions of the court in that respect, and hence his knowledge or ignorance concerning questions of law is not a proper subject of inquiry upon the trial of the challenge for cause." [Internal quotation marks omitted.]). The court also stated that sentencing was not a matter for potential jurors to consider.

The defendant argues that the court's prohibition on his questions regarding the death penalty was an abuse of discretion because studies have indicated that "prodeath penalty jurors would be more likely to harbor racial biases against [the defendant, and it] is proper for defense counsel to inquire regarding the death penalty as a means of exploring potential racial biases in jurors as well as jurors' favorable views of the prosecution." We are not persuaded.

In the defendant's motion, he specifically stated in part that he wanted to gauge the knowledge of prospective jurors concerning current issues, namely the death penalty. We agree with the state and the trial court that such questioning could be misleading and confusing to a potential juror. "[A] juror's knowledge or ignorance with respect to questions of law is not a proper subject of inquiry on voir dire. . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venireman will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination." (Citations omitted; internal quotation marks omitted.) *Lamb* v. *Burns*, 202 Conn. 158, 164, 520 A.2d 190 (1987). "[I]t is important that the trial [court], in the exercise of [its] discretion, be punctilious in restricting counsel's

inquiries to questions which are pertinent and proper for testing the capacity and competency of the juror . . . and which are neither designed nor likely to plant prejudicial matter in his mind." (Citation omitted; internal quotation marks omitted.) *State* v. *Anthony*, 172 Conn. 172, 176, 374 A.2d 156 (1976).

Here, the record reveals that defense counsel was given wide latitude in questioning potential jurors regarding their ability to be fair and impartial and to follow the law. Specifically, he inquired about, inter alia, their feelings about the criminal justice system, about their ability to remain fair and impartial despite the defendant's arrest and the facts of the crimes alleged, about potential sympathy for the victim's mother, and about the presumption of innocence and reasonable doubt. Furthermore, the court never imposed any prohibition on defense counsel's ability to explore potential racial bias or prejudices; rather, it appears that defense counsel chose not to engage in such exploration. On the basis of the foregoing, we conclude that the court did not abuse its discretion in preventing the defendant from questioning potential jurors about the death penalty.

B

On November 5, 2015, the defendant questioned potential jurors about whether they could keep an open mind through the end of trial because "many times, the most important witness is the last witness." After jury selection ended for the morning session, the court noted these questions and told defense counsel that they were problematic because they focused on the final witness, regardless of who that witness might be, and they could lead a juror to conclude that the last witness was more important than other witnesses. The court suggested that counsel could ask the potential jurors whether they would keep an open mind throughout the entire trial.

The defendant argues that his proposed question "did not instruct the juror to place extra weight on the testimony of the last witness; instead, to ensure the juror waits until all the evidence is presented, it asks the juror to be open to the possibility that the last witness is most important. The situation proposed by the statement is true; sometimes the last witness truly *is* the most important." (Emphasis in original.) We conclude that the court did not abuse its discretion in disallowing this question.

As stated in part A of this section: "[I]t is important that the trial [court], in the exercise of [its] discretion, be punctilious in restricting counsel's inquiries to questions which are pertinent and proper for testing the capacity and competency of the juror . . . and which are neither designed nor likely to plant prejudicial matter in his mind." (Citation omitted; internal quotation marks omitted.) *State* v. *Anthony*, supra, 172 Conn.

176. In this case, the court was concerned that defense counsel's focus on "the last witness" might cause the potential jurors to assume that the last witness was special or more important than other witnesses. With this concern in mind, the court told defense counsel that he could ask whether the juror would remain open minded throughout the entire trial, from start to finish, but he could not ask specifically about "the last witness." We conclude that this question has the potential to plant prejudicial matter in the minds of the jurors. See id. Accordingly, we conclude that the trial court did not abuse its discretion in prohibiting it.

V

The defendant claims that the court erred in giving a certain limiting instruction to the jury regarding non-hearsay testimony. He also contends that the court's limiting instruction affected his right to testify in his own defense by affecting his credibility, and, therefore, that this claim is of constitutional magnitude appropriate for *Golding* review.[17] The state argues, in relevant part, that this is nothing more than an alleged evidentiary error, which the defendant failed to preserve. We agree with the state.

The following additional facts inform our consideration of this claim. On January 29, 2016, during a break in the defendant's direct testimony, defense counsel filed a motion requesting to introduce certain out-of-court statements, particularly a statement allegedly made by Calabrese to the defendant on the ground that such statement was being "offered not for its truth but to show its effect on the hearer, [and], therefore, [it] is not hearsay." The court heard argument on the motion, which included the following colloquy:

"The Court: My first question . . . is exactly what statements [are we] talking about. You indicated before the break that you wanted to offer, through your client, a statement that Michael Calabrese said the day after the shooting that, '[i]f I'm going down, you're going down.' Are there other statements that are not identified in this motion that are going to come up?

"[Defense Counsel]: Correct. That statement was made—something to that effect, I don't know the exact language, and I believe—I believe that's all we have, yes.

"The Court: All right.

"[Defense Counsel]: And then that statement affected a number of things after, but that's the one statement essentially. . . .

"The Court: My understanding of your argument, at least one you articulated, is that this is offered not for the truth, but to explain why the defendant took the steps he did and that the state argues constitute consciousness of guilt. Is that correct, that's the argument?

"[Defense Counsel]: Correct, Your Honor. I believe

it's relevant. The state has made consciousness of guilt a large portion of [its] case, particularly things that happened after the homicide, therefore this statement to my client and my client heard on the morning after the homicide colored all of his actions afterwards, and would be, I think, crucial and necessary explanation for why he took some of the steps he did, which would otherwise could raise suspicion with the jury as to consciousness of guilt charge.

\* \* \*

"The Court: So you do want the statement in for the truth, you want the jury to hear those words.

"[Defense Counsel]: We believe the words are important to understand why they would have that impact on the defendant. And I fail to see the prejudice here. I mean, I suppose the jury could be prejudiced against Mr. Calabrese for making a threatening statement, but they already heard numerous statements by Mr. Calabrese here in court that I think would sufficiently prejudice them against him and would already lead them to believe that he could be violent and that he could be threatening, and I don't see . . . prejudice here, that was all on the tape. And the probative value here, the consciousness of guilt evidence, he acts like this because Calabrese says I will essentially—that I will take action to make sure you are guilty.

"The Court: How can you say the jury must hear those particular words and at the same time argue that you're not offering those words for the truth, you don't want the jury to credit those words?

"[Defense Counsel]: They don't need to credit them, they need to understand why the statement was so alarming to my client. Did you know that you could be legally liable for this, that would be different, but if 'I go down, you go down,' he knows that Mr. Calabrese will go down based on what Mr. Calabrese did, that statement is much more alarming than just a general idea of Calabrese saying you could be legally liable.

"The Court: Isn't that the point. I mean, didn't he learn that day or sooner that Michael Calabrese shot Luke Vitalis, and that's in evidence, that Luke Vitalis was dead, that his testimony is that he believed Luke Vitalis was only going to make a drug purchase, that he knew, and you established this, that he gave a gun to Michael Calabrese, he knew he drove Michael Calabrese to Luke Vitalis' house, he knew that he drove Michael Calabrese from Luke Vitalis' house, and this is all of his testimony, all of that is admissible, it's not hearsay, and all of those things would certainly go to why he did the investigation that he did. I don't—again, it seems that you're telling me you don't want the jury to believe the words, but you want them to hear the words, all—and, quite frankly, are less incriminating, the fact that Michael Calabrese said that, than all the

facts I just outlined that are in evidence.

"[Defense Counsel]: I believe that fact that there's a threat would explain the panic on the part of the defendant. And it doesn't matter whether or not it's a credible threat, it matters the language of it and what he hears. I don't think we need to judge whether or not it's a credible threat by Mr. Calabrese, whether or not the language is such it would cause someone in the defendant's position to panic and to take rash actions to try and potentially remove himself from—

"The Court: Did that alarm him more than knowing he now is involved in a murder?

"[Defense Counsel]: I—people—I don't know what his legal knowledge was before this, but it would be reason for him to say I didn't plan this, I didn't have no involvement, I can't get in trouble for it, and then the next morning what Calabrese says, oh, my God, I could be going to jail for that. That's a reasonable thought someone could have being told that threat, and I think the full language of the threat is necessary to communicate why he would panic, why he would take certain actions.

"The Court: Turning to your alternative argument, that this statement by Michael Calabrese is against his penal interest. How is he exposed to prosecution by saying the words, 'If I go down, you go down?'

"[Defense Counsel]: First, it's an admission by Mr. Calabrese that he could be going down. Second, it's tampering with a witness by threatening [the defendant] not to go forward with any information, because he's saying if you take any action to make sure I'm punished, I will make sure you come down with me.

"The Court: [Prosecutor]?

"[The Prosecutor]: There's no—well, I mean, an admission—Mr. Calabrese is not on trial, so the defendant can't offer Mr. Calabrese's statement as an admission. 'If I'm going down, you're going down,' in no way implicates Mr. Calabrese, because it's conditional. I mean . . . it's a conditional situation. He's not saying, 'Yo, man, I did this, you drove me, and if you tell the cops that I did this, I'm telling 'em you drove me.' It's not factual. It's conditional. . . . [H]ow can a conditional statement be a statement against penal interest? It's alleging something in the future.

"[Defense Counsel]: Your Honor, first, if [the defendant] had testified at Mr. Calabrese's trial, this statement would come in as an admission against penal interest. I have no doubt about that. Additionally, we would ask that the state articulate the potential proof of prejudice is so great it would outweigh its probative value. I don't think we've heard any prejudice articulated, but that's a prejudice articulated at this time.

"The Court: What is the prejudice to the state if it's

not offered for the truth?

"[The Prosecutor]: Your Honor, the defendant's whole case is going to be to attempt to discount the credibility of Mr. Calabrese's taped statement, and so they're—inevitably they're going to have to argue that somehow Mr. Calabrese's intent was to frame [the defendant]. . . . And this statement goes directly to that.

"The Court: I understand. Am I correct in my understanding and expectation that if the [court] were to admit it, that there would be no argument in closing argument or at any other time that—no reference to the statement as supporting the defendant's claim that Calabrese's tape recording is not accurate?

"[Defense Counsel]: That's correct. And the idea that we're attacking credibility of Mr. Calabrese, is further evidence we're not producing it for the truth, Mr. Calabrese is lying on the tape, he's lying here.

"The Court: I don't know if it's be[ing] introduced for the truth, but I think I am going to—I'm not confident that this is the only way to get this evidence before the jury and that it's necessary. I will allow it, but there will be a corrective instruction immediately that it's not being offered for the truth, that the jury will not consider it to be the truth, or draw any conclusions or make any findings based upon whether the statement is truthful or not, it's simply offered to explain why the defendant took certain subsequent actions. Is that fair?

"[Defense Counsel]: Very good.

"The Court: All right. Please call the jury."

After the defendant resumed the witness stand, he testified that Calabrese told him: " 'Don't say anything. If I go down, you're going down with me.' " The court immediately provided a limiting instruction to the jury: "All right, at this point, ladies and gentlemen, that is a statement that is offered for a specific purpose, and that is a limited purpose, and so when you engage in your deliberations, you can only consider it for that limited purpose, and it is as follows: That statement, as I understand it, is going to be offered to explain why the defendant took certain subsequent actions. It is not offered for the truth. *It is not offered with the expectation or the understanding that you believe that those were the words that were spoken*. All right. Go ahead." (Emphasis added.) It is the emphasized portion of the court's limiting instruction that the defendant now contends violated his right to testify in his own defense. He alleges that the court effectively undermined his credibility by giving this instruction.

First, we conclude that this claim is an evidentiary matter. Our Supreme Court repeatedly has opined that "because an instructional error relating to general principles of witness credibility is not constitutional in

nature; *State* v. *Patterson*, [276 Conn. 452, 469–71, 886 A.2d 777 (2005)]; the defendant would not be entitled to review of any such claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) . . . .” (Internal quotation marks omitted.) *State* v. *Diaz*, 302 Conn. 93, 114, 25 A.3d 594 (2011). Accordingly, we will not afford *Golding* review to this evidentiary matter.

Moreover, in the present case, the defendant specifically voiced agreement with the court's statement that it would give a limiting instruction, and the defendant, thereafter, failed to object to the precise instruction given by the court. His claim, therefore, is unreviewable. See *State* v. *William C.*, 103 Conn. App. 508, 520 n.6, 930 A.2d 753 (“[t]he defendant did not object at trial, however, to the court's instructions, and, therefore, the unpreserved claim of instructional error is not reviewable”), cert. denied, 284 Conn. 928, 934 A.2d 244 (2007).[18]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was also convicted of murder and conspiracy to commit robbery in the first degree. The trial court vacated his conviction of those charges to avoid double jeopardy concerns, and imposed a total effective sentence of sixty years incarceration, execution suspended after forty years, thirty years mandatory minimum, with five years probation.

[2] Although the defendant agreed with much of the state's evidence, he testified that he previously had sold the Ruger to Calabrese in December, 2011, for $600. He also testified that he had asked Calabrese and Patel to purchase $20,000 worth of marijuana from Vitalis for him, and that he would drop them off and pick them up. Approximately fifteen minutes after dropping off the pair at Vitalis' home, he received a frantic call from Patel telling him to hurry up. Upon driving near the home, the defendant testified, he saw the police and assumed a drug raid had occurred, and, in an effort to mislead police, he sent a text message to Vitalis. He alleged that he had no knowledge of the killing at that time.

[3] “[U]nder the *Pinkerton* doctrine, [see *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)], a conspirator may be found guilty of a crime that he or she did not commit if the state can establish that a coconspirator did commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy.” (Emphasis omitted; internal quotation marks omitted.) *State* v. *Taylor*, 177 Conn. App. 18, 20 n.1, 171 A.3d 1061 (2017), cert. denied, 327 Conn. 998, 176 A.3d 555 (2018).

[4] Because we have concluded that the court did not act unreasonably in denying the defendant's additional request for a continuance, we need not engage in harmless error analysis. See *State* v. *Hamilton*, supra, 228 Conn. 242.

[5] The court also voiced concern that the defendant may have been exaggerating his symptoms, and it pointed to several specific instances where it had to direct the defendant to speak into the microphone.

[6] Of course, it would have been up to the court to rule on a request to strike the prior testimony, but, in any event, the record reveals that the defendant did not undertake such a request.

[7] The defendant claims that certain symptoms of his illness, including his coughing and illness related pauses in his speech, could have been viewed as “tics” that the jury interpreted as indications that the defendant was anxious or lying. The defendant's argument ignores the fact that the jury was told at the outset of the defendant's testimony that he was not feeling well and had laryngitis and bronchitis.

[8] The defendant also requested that we review a video recording of the defendant's testimony made by a news organization. The defendant claims that the recording would allow us to see for ourselves whether the defendant adequately could be heard when he testified. We decline the defendant's invitation for several reasons. First, the recording was not marked as an

exhibit in the trial court and, therefore, is not part of the record before us. Second, we have no way of knowing whether the recording accurately depicts the vantage point of the jury. Third, the state does not dispute that at least some jurors had difficulty hearing the defendant before the morning recess. Finally, the court took steps to address the issue raised by the jury. The defendant does not claim that the jury was unable to hear him after those steps were taken. Nor does he claim that any inaccuracies in the read back of his prior testimony were not immediately corrected or that the court in any way restricted defense counsel's ability to reask questions, the answers to which counsel was concerned the jury might not have heard the first time.

⁹ The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Although the defendant does not clarify whether his claim is brought pursuant to the sixth amendment to the federal constitution or article first, § 8, of our state constitution, the defendant makes no claim that our state constitution provides greater protections, and we, in fact, previously have held that the confrontation clause in our state constitution does not provide greater rights than those guaranteed by the federal constitution. See *State* v. *Jones*, 140 Conn. App. 455, 466, 59 A.3d 320 (2013) ("there exists no legal basis that suggests that our state constitution provides the defendant any broader protection to confront a witness against him"), aff'd, 314 Conn. 410, 102 A.3d 694 (2014).

¹⁰ In its brief, the state does not address the admission of Colwell's testimony. This is not entirely surprising given the manner in which the defendant, in his principal brief, sets forth his argument regarding Calabrese's out-of-court statements. The defendant repeatedly uses the term "statements" to refer to the various statements made by Calabrese in the jailhouse recording. He then makes only passing reference to Colwell's testimony in his brief when discussing the reliability of Calabrese's "statements." The defendant also fails to include any harm analysis directed specifically to Colwell's testimony. Similarly, the defendant, in his reply brief, focuses on "[t]he out-of-court statement made by [Calabrese] to [his cellmate informant] . . . ." In fact, Colwell is not mentioned a single time in the reply brief. Finally, to the extent Calabrese's statements were addressed at oral argument before this court, the defendant discussed only the statements made in the jailhouse recording. Nevertheless, for the same reason that we hold in part B of this section that any evidentiary objection to the admission of the jailhouse recording was not preserved properly by the defendant, we also hold that any claim that the trial court erred by admitting Colwell's testimony as to the statements made to her by Calabrese has been abandoned by the defendant's failure to raise any objection to such testimony at trial after the court denied, *without prejudice*, his motion in limine.

¹¹ Insofar as the defendant failed to renew his objection after the court denied his motion to exclude *without prejudice*, we consider this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015) (defendant can prevail on claim of constitutional error not preserved at trial only if following conditions are met: [1] record is adequate to review alleged claim; [2] claim is of constitutional magnitude alleging violation of fundamental right; [3] alleged constitutional violation exists and deprived defendant of fair trial; and [4] if subject to harmless error analysis, state failed to demonstrate harmlessness beyond reasonable doubt). We conclude, however, that the statements made in the recording were not testimonial in nature, and that this claim, therefore, is not of constitutional magnitude, thus failing *Golding*'s second prong.

¹² "See *United States* v. *Pelletier*, 666 F.3d 1, 9–10 (1st Cir. 2011) (dual inculpatory statement of one inmate to another nontestimonial) (collecting cases from Fourth, Sixth, Eighth, Tenth, and Eleventh Circuit Courts of Appeals), cert. denied, 566 U.S. 1023, 132 S. Ct. 2683, 183 L. Ed. 2d 48 (2012); *United States* v. *Pike*, 292 Fed. Appx. 108, 112 (2d Cir. 2008) . . . (dual inculpatory statement from one inmate to another who was confidential informant nontestimonial where informant's status unknown to declarant), cert. denied, 555 U.S. 1122, 129 S. Ct. 959, 173 L. Ed. 2d 150 (2009), [and cert. denied sub nom. *Pattison* v. *United States*, 555 U.S. 1122, 129 S. Ct. 957, 173 L. Ed. 2d 150 (2009)]; *United States* v. *Underwood*, 446 F.3d 1340, 1346–48 (11th Cir. 2006) (dual inculpatory statements of one inmate to another nontestimonial), cert. denied, 549 U.S. 903, 127 S. Ct. 225, 166 L. Ed. 2d 179 (2006)."

[13] "Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive. *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000); see also *State* v. *Spencer*, 268 Conn. 575, 610, 848 A.2d 1183 (opinions of Second Circuit entitled to significant deference), cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004)." (Internal quotation marks omitted.) *State* v. *Miller*, 95 Conn. App. 362, 382 n.13, 896 A.2d 844, cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006).

[14] To the extent that the defendant also argues that even if the statements were nontestimonial, their admission still violated his right of confrontation, we reject this claim as inconsistent with our law. See *State* v. *Smith*, supra, 289 Conn. 618 ("[n]ontestimonial statements . . . are not subject to the confrontation clause"); *State* v. *Anwar S.*, 141 Conn. App. 355, 361, 61 A.3d 1129 ("[h]earsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence" [internal quotation marks omitted]), cert. denied, 308 Conn. 936, 66 A.3d 499 (2013).

[15] The defendant argues in his reply brief that his evidentiary claim is preserved properly because he did not need to again raise his objection at trial because "no additional information arose." This assertion is not correct. At the time the court rendered its preliminary ruling, neither it nor the parties had the benefit of the informant's testimony. The situation at trial was different when the state offered the recording after the defendant had stipulated that a foundation for its admission had been laid and the informant provided additional foundational testimony before the state offered it into evidence. See generally this part of the opinion. The defendant chose not to conduct any examination of the informant before the statement was admitted into evidence. To the contrary, defense counsel stated that he had "[n]o objection" to the introduction of the statement. The defendant thus made no attempt to seek a definitive ruling from the court on the basis of either the record at trial or the additional testimony he could have procured from the informant. Consequently, not only did the defendant fail to preserve the claim he now raises on appeal, he abandoned the claim at trial.

[16] The death penalty prospectively was repealed by the legislature in 2012. See Public Acts 2012, No. 12-5. Our Supreme Court, thereafter, on August 25, 2015, in *State* v. *Santiago*, 318 Conn. 1, 122 A.3d 1 (2015), declared the death penalty unconstitutional for previous convictions as well.

[17] See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015).

[18] During oral argument before this court, the defendant argued that he properly preserved this claim by raising an objection to a similar limiting instruction given in the court's final instruction to the jury. We disagree. In its final instruction the court stated, "there was testimony by the defendant that Michael Calabrese made a statement to him about, if I go down, you're going down with me, or words to that effect. That was offered for a limited purpose. That was to show the effect of such a statement on the defendant; it is not to be considered by you for the truth of those statements or for you to conclude that those statements were made in those words." After the defendant objected on the ground that the jury was charged incorrectly that it could not "conclude that those statements were made," the court offered the defendant an opportunity to submit a corrective charge to the court. After the luncheon recess, defense counsel confirmed to the court that he no longer was seeking that the jury be recharged on this issue. Thus, any claim that the defendant might have had that the jury was charged incorrectly explicitly was waived by counsel when he declined the opportunity to have the jury recharged.